UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
MICHELLE M. BALLOU,              :
       Plaintiff,                :
                                 :
     v.                          :     CA 07-386 M
                                 :
MICHAEL J. ASTRUE,               :
Commissioner,                    :
Social Security Administration,  :
       Defendant.                :
```

**MEMORANDUM AND ORDER**

This matter is before the Court on a request for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying Supplemental Security Income ("SSI"), under § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) ("the Act").  Plaintiff Michelle M. Ballou ("Plaintiff") has filed a motion for an order reversing the decision of the Commissioner and remanding her SSI claim for further proceedings.  Defendant Michael J. Astrue ("Defendant") has filed a motion for an order affirming the decision of the Commissioner.

With the parties' consent, this case has been referred to a magistrate judge for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c).  For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and is legally correct.  Accordingly, based on the following analysis, I order that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. #12) ("Motion to Affirm") be granted and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. #11) ("Motion to Reverse") be denied.

**Facts and Travel**

Plaintiff was born in 1978. (Record ("R.") at 40)  At the time of the hearing before the Administrative Law Judge ("ALJ") she was twenty-eight years of age. (Id.)  Plaintiff left high school in the tenth grade, but obtained her GED in 2006 by attending adult education classes for four or five months. (R. at 42-43)  Plaintiff also took classes in 2001 to become a Certified Nursing Assistant, (R. at 71), and subsequently worked in that capacity, (R. at 41).

Plaintiff filed an application for SSI on or about December 15, 2004, (R. at 23), alleging disability since July 1, 2002, (R. at 84), as a result of a seizure disorder/fainting disorder, (R. at 114).  The application was denied initially, (R. at 13, 79), and on reconsideration, (R. at 13, 78), and a request for a hearing before an ALJ was timely filed, (R. at 13, 80-81).  The hearing was held on February 12, 2007, at which Plaintiff, represented by counsel, appeared and testified. (R. at 13, 36-72)  Michael Laraia, a vocational expert ("VE"), also testified. (R. at 36, 72-76)  On March 28, 2007, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. at 13-23)  Plaintiff requested review by the Appeals Council, (R. at 9), which on August 21, 2007, denied her request, (R. at 5-7), thereby rendering the ALJ's decision the final decision of the Commissioner, (R. at 5).  Plaintiff thereafter filed this action for judicial review.

**Issue**

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

**Standard of Review**

The Court's role in reviewing the Commissioner's decision is

limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).
Although questions of law are reviewed *de novo*, the
Commissioner's findings of fact, if supported by substantial
evidence in the record,[1] are conclusive.  Id. (citing 42 U.S.C. §
405(g)).  The determination of substantiality is based upon an
evaluation of the record as a whole.  Id. (citing Irlanda Ortiz
v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir.
1991)("We must uphold the [Commissioner's] findings ... if a
reasonable mind, reviewing the evidence in the record as a whole,
could accept it as adequate to support his conclusion.")(second
alteration in original)).  The Court does not reinterpret the
evidence or otherwise substitute its own judgment for that of the
Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health &
Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "Indeed, the
resolution of conflicts in the evidence is for the Commissioner,
not the courts."  Id. at 31 (citing Rodriguez v. Sec'y of Health
& Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing
Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426
(1971))).

**Law**

An individual is eligible to receive SSI if she is aged,
blind, or disabled and meets certain income requirements.  See 42
U.S.C. § 1382(a).  The Act defines disability as the "inability
to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be

---

[1] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)); see also Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999)(quoting Richardson v. Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. 423(d)(1)(A). A claimant's impairment must be of such severity that she is unable to perform her previous work or any other kind of substantial gainful employment which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[2] 20 C.F.R. § 416.921(a) (2008). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986).

The Social Security regulations prescribe a five step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 416.920(a) (2008); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one of the Commissioner's listed impairments; (4) whether she is able to perform her past relevant

---

[2] Section 416.921 describes "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b) (2008). Examples of these include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

Id.

4

work; and (5) whether she remains capable of performing any work within the economy. See 20 C.F.R. § 416.920(b)-(g). The evaluation may be terminated at any step. See Seavey v. Barnhart, 276 F.3d at 4. "The applicant has the burden of production and proof at the first four steps of the process. If the applicant has met her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

### ALJ's Decision

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had engaged in substantial gainful activity through June 2004, (R. at 15); that her psychological nonepileptic seizures and anxiety/depression-NOS[3] were "severe" within the meaning of the Regulations, (id.); that, nonetheless, her claimed impairments, either singly or in combination, did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926), (id.); that Plaintiff retained the residual functional capacity ("RFC") to perform work at the light exertional level which is unskilled, routine, and repetitive in nature, (R. at 22); that considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs which exist in significant numbers in the national economy which Plaintiff could perform, (id.); and that, therefore, Plaintiff had not been under a disability, as defined in the Act, since December 15, 2004, the

---

[3] NOS means "Not Otherwise Specified." See Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 381 (discussing "Depressive Disorder Not Otherwise Specified" category of mental disorders).

date the application was filed, (R. at 23).

## Error Claimed

Plaintiff alleges that the ALJ's mental RFC findings are not supported by substantial evidence in the record. See Plaintiff's Memorandum in Support of her Motion to Reverse the Decision of the Commissioner ("Plaintiff's Mem.") at 9. In particular, Plaintiff challenges the ALJ's findings that Plaintiff had only a mild limitation in activities of daily living, a mild limitation in social functioning, and a moderate impairment in concentration, persistence, and pace. See id. Plaintiff contends that as a result of these erroneous findings the ALJ erred in concluding that Plaintiff was capable of performing "unskilled, routine, and repetitive tasks." Id. at 10.

## Discussion

Plaintiff argues that the ALJ erred in giving no weight to the findings of James K. Sullivan, M.D. ("Dr. Sullivan"), who performed a psychiatric evaluation of Plaintiff at the request of her attorney. See id. The ALJ explained that she afforded no weight to Dr. Sullivan's opinion because: 1) it was not consistent with the medical evidence as a whole, 2) it was not consistent with Plaintiff's own testimony, 3) it was the result of a one time examination which was performed at the request of Plaintiff's attorney for the sole purpose of supporting Plaintiff's disability claim and his report was more akin to an advocacy opinion than to objective evidence, and 4) the question of whether Plaintiff was able to sustain full-time employment was a matter reserved to the Commissioner. (R. at 21) With respect to a Supplemental Mental Residual Functional Capacity Questionnaire completed by Dr. Sullivan, the ALJ stated that she gave little weight to this document because it was crouched in broad, general terms that were not translated into a vocationally relevant, function-by-function assessment. (R. at 22) This made

it impossible, in the ALJ's view, to determine from the form what specific impact Plaintiff's mental impairments had on her ability to function and what Plaintiff was capable of doing despite her mental impairments. (Id.)  The ALJ noted that while Dr. Sullivan had opined that Plaintiff's degree of restriction of daily activities was moderately severe, (R. at 320), W. Curt LaFrance, M.D., ("Dr. LaFrance"), who performed a consultative neuropsychiatric evaluation of Plaintiff on October 13 and 31, 2006, believed that Plaintiff might benefit from involving herself in social activities and that Dr. LaFrance "did not indicate that she was incapable, or highly limited in her ability to do so," (R. at 22).  Although not specifically identified as a reason for discounting Dr. Sullivan's report, the ALJ also stated that "Dr. Sullivan was provided no records, including the report of Dr. LaFrance."  (R. at 20)

   The reasons given by the ALJ for rejecting Dr. Sullivan's opinion is supported by substantial evidence in the record.  As the ALJ accurately stated, the opinion was inconsistent with the other medical evidence in the record, especially the evidence from Plaintiff's treating physicians.  In contrast to Dr. Sullivan, who opined Plaintiff was incapable for full-time employment, Caroline Troise, M.D. ("Dr. Troise"), whose office treated Plaintiff from at least August to December of 2004, (R. at 132-41), placed no work restriction on Plaintiff and recorded on December 9, 2004, that "Plaintiff will stay home by her decision,"[4] (R. at 139).  Plaintiff also treated with Richard Cervone, M.D. ("Dr. Cervone"), of Garden City Neurology, Ltd., from at least March to June of 2005.  (R. at 164-76)  In a very detailed progress report dated May 3, 2005, Dr. Cervone wrote in part:

---

[4] This entry was made by Peter F. Sholler, M.D. ("Dr. Sholler"), who appears to be an associate of Dr. Troise.  (R. at 139)

7

> After I discussed my professional opinion with her, she had a variety of reservations with regards to returning to her usual work as a private-setting CNA which requires her to work mostly one-on-one with patients/clients.
>
> She stated that she "cannot return" to her job because she could possibly faint while she is working alone with only one patient. I explained to her that it has been her exclusive choice to only work in the private CNA setting and as a result, this particular restricted choice which she is clearly making for herself may need to be re-assessed. I gave her an example of some of my other patients who have long-standing low back and/or neck pain conditions which preclude them from performing heavy work but when they changed their job setting avoiding such heavy work, they were still able to remain fully employed. I also have moderate to severe epilepsy patients who are still working on a regular basis while they are being treated and are still not perfect.
>
> I have recommended that she consider working within a setting which would include other fellow CNA workers which would tend to be safer for her until she receives some additional treatment in order to stabilize the swings in her blood pressure. This could be achieved when working in a larger group home CNA setting. However, she described that she refuses to do this and I informed her that **this is her own restricted choice/preference and is not in any way suggestive of her not being able to work at ANY job.**

(R. at 174)(bold added).

Dr. LaFrance, who examined Plaintiff on October 13 and 31, 2006, apparently held the same opinion as Dr. Cervone regarding Plaintiff's ability to work. The record reflects that Dr. LaFrance refused to complete SSI disability paperwork for Plaintiff, (R. at 360), causing her to want to "fire," (id.), him. Thus, Dr. Sullivan's opinion that Plaintiff was incapable of maintaining full-time employment was directly at odds with the opinions of at least three of Plaintiff's treating physicians.

Equally, if not more, significant is the fact that Plaintiff's own testimony conflicts with Dr. Sullivan's opinion

8

that she had: 1) a moderately severe restriction of her daily activities,[5] (R. at 320); 2) a moderately severe constriction of her interests, (id.); and 3) a moderately severe restriction of her ability to: a) understand, carry out, and remember instructions, (id.), b) perform complex tasks, (id.), c) perform repetitive tasks, (R. at 321), and d) perform varied tasks, (id.). Plaintiff testified that she takes her eight year old son to school every day in the morning and then picks him up again in the afternoon. (R. at 49, 52, 66) She goes to her girlfriend's house once or twice a week for a couple hours, during which time they have tea, talk, and watch television.[6] (R. at 55) Plaintiff also goes out to do the laundry, (R. at 51), to attend doctor appointments, (R. at 52), to do grocery shopping, (id.), "to run errands, Wal-Mart," (R. at 53), to pick up prescriptions at CVS, (id.), to go to the library with her son, (R. at 54), and to buy crossword books at the Dollar Store,[7] (R. at 54). At the library, Plaintiff uses the computer to obtain information, including information about "pharmacy tech classes." (Id.) Plaintiff also emails two girlfriends in Massachusetts. (R. at 54) She has a former boyfriend, Ricky, (R. at 53), who helps her

---

[5] Examples of daily activities are: "ability to attend meetings (church, lodge, etc), work around the house, socialize with friends and neighbors, etc." (R. at 320)

[6] It appears that Plaintiff drives to her girlfriend's house. The Court infers this based on the following fact. In responding to the ALJ's question as to whether the girlfriend ever came to Plaintiff's home, Plaintiff answered "No, she doesn't drive." (R. at 55) This answer indicates that the distance between the two homes is such that it requires driving. Because Plaintiff did not mention anyone going with her to her girlfriend's home, it can be inferred that Plaintiff drove herself on these visits.

[7] Plaintiff's trips to the Dollar Store to buy crossword books appears to be relatively frequent. When asked how long it took her to complete one of these books, Plaintiff answered: "I'm fast, so I can finish a book probably in a week." (R. at 57)

with tasks around the home, (R. at 52).  She also has a close friend, Damien, who visits her in her home.  (R. at 55, 56)  In addition to her son, Plaintiff has a pet dog for whom she cares.  (R. at 60)  These activities, taken collectively, are inconsistent with a moderately severe restriction of daily activities and a moderately severe constriction of Plaintiff's interests.[8]  Plaintiff's ability to do more than one crossword "at a time," (R. at 57), and to finish a book of crosswords in a week, (id.), is inconsistent with the moderately severe mental impairments which Dr. Sullivan assessed.  (R. at 320-21)  It is also at odds with Plaintiff's statement to Dr. Sullivan that she has "tremendous difficulty concentrating and following through on tasks."  (R. at 318)

In determining the weight to be given to Dr. Sullivan's opinion, the ALJ could properly take into consideration the fact that he was not a treating physician and that he only saw Plaintiff on a single occasion.  See 20 C.F.R. § 1527(d).  To the extent that Plaintiff contends that the Court should find error because the ALJ characterized Dr. Sullivan's opinion as "more akin to an advocacy opinion," (R. at 21), and that the ALJ impliedly penalized Plaintiff for the fact that the report was procured by Plaintiff's attorney, the Court is not so persuaded.  The ALJ gave additional reasons for discounting Dr. Sullivan's report, and an ALJ's decision "can still pass muster if the other reasons given to accord medical reports little weight are

---

[8] It bears noting that Plaintiff was able to attend adult education classes for four or five months in 2006 and successfully obtain her GED as a result.  (R. at 42-43)  Yet she alleged in her application that her disability began on July 1, 2002.  (R. at 84)  In addition, at the hearing she initially testified that she did not work after July 1, 2002.  (R. at 41)  However, after the ALJ cited records showing that Plaintiff had "fairly significant earnings," (R. at 41), in 2003 and 2004, Plaintiff acknowledged working during those years, (id.).

10

adequately supported." Arroyo v. Barnhart, 295 F.Supp.2d 214, 221 (D. Mass. 2003)(citing Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998); Gonzalez Perez v. Sec'y of Health & Human Servs., 812 F.2d 747, 749 (1st Cir. 1987)). That is exactly the case here as additional reasons cited by the ALJ are amply supported by the record.

Plaintiff takes issue with the ALJ's statement that "Dr. Sullivan was provided no records, including the report of Dr. LaFrance," (R. at 20), and argues that "Dr. Sullivan did not specify what records she [sic] had or hadn't reviewed," Plaintiff's Mem. at 10. However, the inference that Dr. Sullivan did not review any other records prior to preparing his report is certainly reasonable. Most physicians who provide consultative reports routinely identify the records they have reviewed in connection with preparing their reports. It was reasonable for the ALJ to infer from the fact that Dr. Sullivan did not mention reviewing records that no records were provided to him. This is particularly true given that Dr. Sullivan's evaluation was conducted at the request of Plaintiff's counsel for the sole purpose of supporting Plaintiff's disability claim. If Dr. Sullivan had reviewed Plaintiff's medical records, it would provide an additional basis for his opinion beyond the information which he obtained in his one time evaluation of Plaintiff. The Court doubts that such a supportive factor would be omitted from his report if a review of records had occurred. Moreover, even if Dr. Sullivan reviewed records and failed to mention this fact, the ALJ's assumption to the contrary is at the most harmless error. The other reasons which she gave for discounting Dr. Sullivan's report are sufficient to constitute substantial evidence.

It is indisputable that whether Plaintiff is capable of performing full time employment is a matter reserved to the

11

Commissioner. 20 C.F.R. § 404.1527(e)(1); <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991); <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981). In citing this fact as a reason for rejecting Dr. Sullivan's contrary opinion, the ALJ did not err. The ALJ's decision to afford little weight to the Supplemental Mental Residual Functional Capacity Questionnaire completed by Dr. Sullivan because the ratings expressed were not translated into a vocationally relevant, function-by-function assessment is similarly not error. This is especially true in this case where Dr. Sullivan's ratings of moderately severe in several areas were significantly at odds with the activities and capabilities to which Plaintiff testified.

Plaintiff argues that both Dr. Sullivan and Dr. LaFrance diagnosed Plaintiff with depression and assessed her GAF[9] in the serious range. However, Dr. Sullivan diagnosed a Major Depressive Disorder, (R. at 319), while Dr. LaFrance diagnosed a Depressive Disorder (not otherwise specified), (R. at 325), a different and less severe impairment.[10] Moreover, a GAF rating only refers to the individual's perceived functioning at the time

---

[9] The Global Assessment of Functioning ("GAF") "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004)(quoting DSM-IV-TR at 32). The GAF "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV-TR at 34. A GAF score between 41-50 is indicative of "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." <u>Id.</u>

[10] "The essential feature of Major Depressive Disorder is a clinical course that is characterized by one or more Major Depressive Episodes ...," DSM-IV-TR at 369, while "[t]he Depressive Disorder Not Otherwise Specified category includes disorders with depressive features that do not meet the criteria for Major Depressive Disorder [or other mood disorders]." DSM-IV-TR at 381.

of the evaluation. See Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 33. In addition, although Dr. Sullivan wrote in his January 20, 2007, report that Plaintiff "feel[s] isolated and alone (tearful)," (R. at 318), and that she "states that she experiences sadness and depression on a daily basis," (id.), only three weeks later, at the February 12, 2007, hearing before the ALJ, Plaintiff testified that she did not think that she suffered from depression, (R. at 62). Plaintiff argues that her testimony should not be controlling on the issue of whether her symptoms were caused by a depressive disorder because "it is clear she lacked insight into the psychiatric nature of her impairments and continued to believe her seizures were organically caused." Plaintiff's Mem. at 10. However, the ALJ found that Plaintiff's anxiety/depression were severe impairments. (R. at 15) To the extent that Plaintiff contends that her depression was disabling to a degree inconsistent with employment, the only evidence in the record supporting such position is Dr. Sullivan's opinion which the ALJ discounted for valid reasons. Although Plaintiff notes that records from Frank Fallon, D.O. ("Dr. Fallon") mention depression, anxiety, and panic, see Plaintiff's Mem. at 10, see also (R. at 309, 311), the mere "mention" of these conditions does not carry Plaintiff's burden of producing evidence of resulting limitations.

Plaintiff partially quotes the ALJ and takes issue with the statement that Plaintiff "has a pseudoseizure disorder which testing has demonstrated is, to a very significant extent, under her control and used by her to control and manipulate others around her."[11] Plaintiff's Mem. at 10-11. Based on this partial

---

[11] The complete statement by the ALJ is: "[Plaintiff] continues to drive because she knows she does not have an epileptic disorder–she has a pseudoseizure disorder which testing has demonstrated is, to a very significant extent, under her control and used by her to control

13

quotation, Plaintiff charges that the ALJ has "essentially made her own diagnosis." Id. at 10. The Court disagrees.

The actual severe impairment found by the ALJ was "psychological nonepileptic seizures." (R. at 15) Her subsequent reference to this condition as a "pseudoseizure disorder," (R. at 20), is consistent with references in the medical record showing a diagnosis of possible pseudoseizures, (R. at 242, 245, 287, 291, 296, 299). In addition, the term "pseudoseizure" means "an attack resembling an epileptic seizure but having purely psychological causes ...." Dorland's Illustrated Medical Dictionary, 1380 (28th ed. 1994). Thus, the ALJ's characterization of Plaintiff's psychological nonepileptic seizures as pseudoseizures is not inaccurate. Moreover, there is support in the record for the ALJ's statement. Plaintiff's eye blinking and moaning during spells coincided with treatment providers entering the room and were not accompanied by any corresponding changes in her EEG. (R. at 233-236)

Furthermore, the Court finds the ALJ's reasoning with respect to the statement highly persuasive. Plaintiff testifies that she drives her eight year old son to and from school every day. (R. at 49, 66-67) Yet, she also testified that she has "spells every single day," (R. at 58), and "full blown seizures, at least two times a week," (id.). She testified that the seizures have caused her to fall down stairs and to crash her car, (id.), and that after she has them she usually sleeps for a few hours, (id.). If the seizures were occurring with the frequency and severity which Plaintiff claims, her decision to drive with her young son in the car is reckless in the extreme. Under questioning by her attorney, Plaintiff testified that "[w]hen it comes to taking my son to school, no, I don't have an

---

and manipulate others around her." (R. at 20) (citing R. 198, 295-303).

14

alternative.  I have no support from anybody ...." (R. at 67) Even assuming that this is true, if Plaintiff were subject to uncontrollable seizures of the frequency and severity to which she testified, the risk to which she is subjecting her child by driving him to and from school far exceeds any risk he might face walking or riding the school bus.  Thus, the ALJ reasonably concluded that Plaintiff "is not afraid of having an accident an[d] injuring herself or others because she knows she will not have a seizure."  (R. at 20)

Moreover, the ALJ provided additional explanation for her conclusion:

> [A]lthough it was reported several times in the record that the claimant has seen counselors, no records at all regarding this treatment have been submitted by the claimant.  The claimant consistently discontinued medications prescribed for seizures, claiming various side effects, even after only brief periods on the medication, adjusted dosages, and physician recommendations.  The claimant has reported to Dr. Sullivan and Dr. LaFrance that she suffers from seizures lasting up to 30 minutes, and accompanied by incontinence, tongue biting, etc., but previously, she informed Dr. Kim that they lasted only 2 to 3 minutes. The only time the claimant has experienced incontinence was when it was noted by Dr. LaFrance that during a seizure in 2003, records showed that the claimant spilled her water bottle on herself during a 2003 episode at her podiatrist's office.  No other physician has observed incontinence despite numerous "spells" in the record. Dr. Cervone told the claimant unequivocally that her disorder did not preclude her from working, and that her choice to work only as a private CNA or not at all was strictly her choice, but was not medically dictated. Dr. Troise[12] likewise indicated that the claimant's decision not to work was strictly her own.  Finally, the undersigned notes that the claimant had a "seizure" in the waiting area prior to the start of the November, 2006, hearing, but left the emergency room without being seen and refused anti-seizure medication or a psychiatric

---

[12] See n.4.

15

>appointment.

(R. at 20-21). Plaintiff has not challenged the accuracy of any of the above statements, and they are supported by the record.

### Summary

In summary, substantial evidence supports the ALJ's findings that Plaintiff has only a mild limitation in her activities of daily living, a mild limitation in social functioning, and a moderate impairment in concentration, persistence, and pace. Accordingly, the ALJ did not err in concluding that Plaintiff is capable of performing unskilled, routine, and repetitive tasks. The ALJ validly discounted Dr. Sullivan's opinion that Plaintiff's limitations were more severe because it was not consistent with the medical record as a whole and with Plaintiff's own testimony. Substantial evidence also supports the ALJ's conclusion that Plaintiff's seizure disorder is to a significant extent under Plaintiff's control.

### Conclusion

The ALJ's determination that Plaintiff was not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record. Accordingly, I order that Defendant's Motion to Affirm be granted and that Plaintiff's Motion to Reverse be denied.

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
April 27, 2009